[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This interpleader action arose out of a contract for the purchase and sale of real property owned by Tuck-It-Away, Bridgeport, Inc., located at 672 Bostwick Avenue in the City of Bridgeport, Connecticut. Under the provisions of the contract (Ex. A), Tuck-It-Away agreed to sell to Vestpro Corporation, a New York Corporation, the subject premises for the purchase price of $1,900,000.00. The sum of $100,000.00 was deposited in escrow with Tuck-It-Away's attorneys, Pullman, Comley, Bradley and Reeves of Southport, Connecticut, to be applied to the purchase price at the closing of the sale. The closing was to take place 120 days after the date of the contract (April 13, 1988), with the right in Vestpro to adjourn such closing for up to four (4) successive additional periods of 30 days each upon payment to Tuck-It-Away, the sum of $15,000.00 for each 30 day adjournment. Vestpro exercised all four (4) rights of adjournment, and the final date for closing was designated as December 10, 1988. The closing did not take place and each party to the contract now claims the right to the $100,000.00 deposit.
This action was brought by the law firm of Pullman, Comley, Bradley and Reeves, as stakeholder of the escrow fund and as plaintiff. An Interlocutory Judgment for Interpleader was CT Page 7591 granted by this court and both claimants have appeared as defendants to assert their respective claims. Interestingly, the firm of Pullman, Comley, Bradley and Reeves, the plaintiff, has appeared on behalf of the defendant claimant, Tuck-It-Away.
As part of the evidence presented, the respective defendant claimants have stipulated and agreed to a number of facts as follows:
 1. Tuck-It-Away is a Connecticut Corporation with its principal place of business at 672 Bostwick Avenue, Bridgeport, Connecticut.
 2. Vestpro is a New York Corporation with an office at 733 Third Avenue, New York, New York 10017.
 3. On or about April 13, 1988, Tuck-It-Away and Vestpro signed a Contract of Sale of Real Estate for real property located in Bridgeport Connecticut (`Contract'). A true and correct copy of the Contract, marked Exhibit `A', is attached hereto.
 4. Tuck-It-Away was represented in the sale by David Jackson and Michael Proctor of Pullman 
Comley.
 5. Vestpro was represented in the sale by Gary Kleinman of Baer, Marks and Upham.
 6. Pursuant to the Contract, $100,000.00 was deposited in escrow with Pullman, Comley, Bradley Reeves as escrowee. This is the money presently in dispute between the parties.
 7. The original closing date under the Contract was 120 days from the signing of the contract.
 8. By correspondence dated October 14, 1988, Tuck-It-Away and Vestpro agreed in writing to extend the closing date until December 10, 1988. A true and correct copy of that correspondence, marked Exhibit `B', is attached hereto.
9. On December 10, 1988, no closing took place.
10. On or about December 14, 1988, Tuck-It-Away CT Page 7592 received a letter from Vestpro porporting to cancel the Contract on the basis of three alleged title failures:
a. A Lis Pendens dated August 9, 1983;
b. A Certificate of Attachment dated June 27, 1988;
c. The nonconformity of the legal description in Schedule `A' of the Contract with a September 17, 1988 Plan of Survey.
A true and correct copy of that correspondence is attached hereto as Exhibit `C'.
11. Tuck-It-Away's attorneys had a Release of the August 9, 1983 Lis Pendens in their possession before December 10, 1988. A true and correct copy of which, marked Exhibit `D', is attached hereto. Tuck-It-Away's attorneys also had in their possession a Certificate of Disposition showing the underlying action had been dismissed on September 25, 1986. A true and correct copy of which, marked Exhibit `E', is attached hereto.
12. Tuck-It-Away had in its possession a Release of the June 27, 1988 Attachment before December 10, 1988. Tuck-It-Away's attorneys were not aware Tuck-It-Away had such release until after December 10, 1988. A true and correct copy of said release, marked Exhibit `F', is attached hereto.
13. The description of the property to be conveyed was contained in Schedule `A' to the Contract. The Schedule `A' described a Piece of real estate from which was excepted a parcel described by reference to a survey map dated December 7, 1983 (`December 1983 Survey'). A true and correct copy of the Survey is attached hereto as Exhibit `G'.
14. The December 1983 Survey referenced in Schedule `A' showed a series of courses and lengths. One such length was incorrectly shown as 24.87 feet, when in fact it was 21.26 feet. The December 1983 Survey was in all other CT Page 7593 regards accurate, correct and to scale.
15. The course shown in the December 1983 Survey with the incorrect length formed part of the boundary line between the property described in Schedule `A' which was to be conveyed and that which was excepted from the conveyance.
16. The real property which was the subject of the Contract for Sale in fact consisted of five adjacent buildings used as `self-storage' rentals available to the public.
17. The `boundary line' referred to in paragraph 16 above, including the incorrectly marked course, in fact describes abutting walls between two otherwise separate buildings, only one of which was to be conveyed to Vestpro.
18. At the time the Contract for Sale was executed, neither Tuck-It-Away or Vestpro was aware that the December 7, 1983 Survey contained an incorrect length.
19. On or about September 16, 1988, attorneys for both Tuck-It-Away and Vestpro received a survey for the subject property from Preferred Land Title Services, Inc. A true and correct copy, marked Exhibit `H', is attached hereto.
20. At no time prior to the correspondence dated December 12, 1988 did Vestpro ever advise or complain to Tuck-It-Away concerning the nonconformity of Schedule `A'.
At the trial, in addition to the above stipulation of facts, each defendant claimant offered evidence in support of its respective claims. The defendant Vestpro's evidence in support of its claims may be summarized as follows:
As noted in the stipulation of facts, Vestpro is a New York Corporation with an office at 733 Third Avenue, New York. Alan Goldman, Vice-President of Vestpro, testified that it was engaged in the mini-storage business, and, as such, engaged in locating old buildings which could be renovated, principally, into small cubicles which would then be leased to the general public for storage purposes. In order to purchase and renovate such buildings, Vestpro required funds from outside investors, which funds, Vestpro, on its own, was unable to furnish. CT Page 7594 Designated as a joint venture partner in Vestpro was one, Stephen Hochman, a practicing attorney in New York, whose function was to solicit such investors. It appears that members of large law firms were particularly attracted to this type of investment and, Hochman sought such firms as a source of investment funds. In this case, it appears that Hochman was working with the law firm of, one, Kaye Scholer, to raise the money for the acquisition of the property which is the subject of the contract. The evidence disclosed that Hochman was seeking an investment of $5,100,000.00 to cover the cost of purchasing the property, renovating the same and fees involved.
As stipulated, the closing date in the contract was to be 120 days from the date of the contract, April 13, 1988. As noted, Vestpro did not have the required funds at such original closing date, and, in accordance with the provisions of the contract, several extensions were agreed upon. The final agreed upon extension date for the closing was December 10, 1988. As the date of December 10, 1988 neared, it appeared that the sought after total funds from Kaye Scholer were not yet available. As a result, either on December 6th or 7th, 1988, Alan Goldman called Gerald Sprayragen, owner of Tuck-It-Away to ask for an appointment. The parties met at Sprayragen's office in New York on December 7, 1988. At that meeting, Goldman told Sprayragen that Scholer's Group did not yet have the total amount required ($5,100,000.00, not $1,800,000.00 balance of the purchase price), but it was "close" and, that, one, Unger, a member of Scholar's firm was optimistic, and a further extension was needed. Sprayragen demanded compensation before agreeing to any further extension. Goldman felt he shouldn't pay anything for the extension. It should be noted in passing that the contract provided for four extensions upon payment of $15,000.00 for each extension, and, that, payments were made for each extension, although less than the contract provision. No agreement for an extension resulted from this meeting, and, although, Sprayragen testified that it was now a foregone conclusion that there would be no closing on December 10, 1988, it was Goldman's testimony that he did not, in so many words, tell Sprayragen that Vestpro "could not or would not close on the closing date." He further stated that Hochman had assured him that even if it took his own (Hochman's) money, the closing would take place. Under cross-examination, however, he admitted that he had never discussed this prospect with Hochman.
On December 9, 1988, the day before the scheduled closing, Goldman and Hochman met with the Scholer Group for the purpose of discussing the general situation. It was Goldman's view that certain options were available, namely: paying for an extension, whether, through the Scholer Group or through Hochman. No decision was reached because during the meeting, a call was CT Page 7595 received from Gary Kleinman, the attorney representing Vestpro, relating that he had discovered a discrepancy in the length of one of the courses in the property description. In Kleinman's words, "You got lucky." It was decided to send a letter to Sprayragen and David O. Jackson, the attorney in the Pullman and Comley firm representing Tuck-It-Away, electing to cancel the contract under the provisions of Paragraph 11 of the contract because of the now discovered inability of Tuck-It-Away to convey title to the premises in accordance with the provisions of the contract. Specifically, this letter (Ex. C) spelled out the reasons as follows:
1. A certain lis pendens in favor of Anthony J. Ruscito against Sprayragen and Tuck-It-Away dated August 19, 1983 and recorded in Volume 1698, page 995 of the Bridgeport Land Records which had not been discharged of record;
2. A Certificate of Attachment against Tuck-It-Away, dated June 27, 1988 in favor of Labor Force of America and recorded on June 27, 1988 in Volume 257, page 71 of the Bridgeport Land Records; and
3. The legal description of the premises in the contract did not conform to the survey of the premises prepared by Fuller and Co., Inc., surveyors, dated September 17, 1988.
(Actually, this survey was dated September 15, 1988 and was a revised survey from one earlier, dated December 7, 1983, from which the legal description in the Contract (Ex. A) was taken. The earlier survey listed the length of one of the courses in the description as 24.87 feet whereas the revised survey listed the same course as 21.26 feet.)
Although the testimony indicated that this letter (Ex. C) was prepared on December 9, 1988, the date of the meeting with the Scholar Group, it was not mailed until the close of day on December 12, 1988.
Further, on behalf of Vestpro, Stephen Hochman, the designated investor finder and joint venture partner, testified that he was present at the December 9, 1988 meeting with the Scholer Group. It was his contention that part of his role was to show Kleinman how he could obtain an extension from Sprayragen and that he was involved in the drafting of the December 12, 1988 letter (Ex. C). His final offering was that he personally could have paid not only for the extension but also for the $1,800,000.00 balance of the purchase price. He claimed that during the week of December 5, 1988, he had called his father in Florida and requested him to be prepared to wire the sum of $1,800,000.00 on short notice. There is no evidence CT Page 7596 of his father's response.
Gary Kleinman, Vestpro's New York attorney, testified that the letter of December 12, 1988 (Ex. c) was mailed from his office. In addition, although the letter indicates a certified copy to David Jackson, attorney for Tuck-It-Away, he also faxed a copy to Jackson. It was his opinion that Vestpro could now buy some time. Under cross-examination, although he first indicated that he Understood Vestpro could pay the purchase balance of $1,800,000.00 on December 10, 1988, he later admitted that he had no information either way. Although, he claimed to have first become aware of the discrepancy in the aforementioned legal description in one of the courses, he admitted that, one, Pidluski, President of Fuller and Company may have previously told him that the dimension discrepancy was caused by a scrivener error, and, more definitely, that Pidluski had said that such error could be corrected by filing a new map. He was certain that at some point he had warned his client, Vestpro, of the risk of not appearing at the closing.
Note should be taken of one further matter at this time. It was Vestpro's claim that since December 10, 1988 fell on a Saturday, it was agreed that the closing would actually take place on the next business day, December 12, 1988. There is nothing in the evidence to corroborate such an agreement. As a matter of fact, Sprayragen denied any such agreement.
The defendant Tuck-It-Away's evidence supporting its claims may be summarized as follows:
Gerald Sprayragen, owner of Tuck-It-Away, testified and some of the matters in his testimony have already been mentioned heretofore. He told of the meeting with Alan Goldman during the early part of the week of December 5, 1988 and Goldman's request for another extension beyond December 10, 1988, although there was no money to pay for it. After the meeting with Goldman, there was a call from Hochman relative to the same request for an extension. It was the same scenario. Vestpro wanted an extension but there was no money to pay for it. There was some indication that a tentative agreement had been reached for the payment of ten to fifteen thousand dollars for an extension of 60 days. However, during the phone conversation with Hochman, when Hochman attempted to change the terms, Sprayragen hung up on him. According to Sprayragen, there was never a written agreement to extend the closing date beyond December 10, 1988 and there was never an agreement or even discussion of a closing date of December 12, 1988.
After the telephone discussions with Goldman and Hochman, it was Sprayragen's testimony that he knew there would be no CT Page 7597 closing on December 10, 1988, and, further, that no request from Vestpro for a closing either on December 10th or 12th was ever received.
With respect to the letter of December 12, 1988 (Ex. C) cancelling the contract and outlining the defects in title, the first notice received by Sprayragen was several days later when the letter was received. He was told by Goldman that the letter was his attorney's idea, not his (Goldman's).
It was during Sprayragen's testimony that Ex. D, a release of the lis pendens, dated December 1, 1988, was introduced into evidence. It was during Sprayragen's testimony that Ex. E, a dismissal of the action involving said lis pendens was entered into the court records on September 25, 1986, and a certificate from the court clerk attesting to the same on December 1, 1988 provided. It was during Sprayragen's testimony that Ex. F, a release of the attachment of Labor Force of American, Inc. dated October 13, 1988, was entered into evidence. Exhibits D, E and F were in the possession of Tuck-It-Away prior to December 10, 1988. These facts were stipulated by the parties in paragraphs 11 and 12 of the stipulations entered into evidence.
Michael Proctor, an attorney with Pullman, Comley, Bradley and Reeves, who was assisting Attorney David Jackson with the transaction, corroborated the testimony of Sprayragen with respect to Exhibits D, E and F, although he was not aware that the release of attachment (Ex. F) was in the possession of Tuck-It-Away prior to December 10, 1988. Actually, he was not even aware that Vestpro was claiming said attachment as a title defect until receipt of the letter of December 12, 1988 (Ex. C). As a matter of fact, the only objection to the title claimed by Vestpro prior to the letter of December 12, 1988 (Ex. C) was in a letter from Vestpro's attorneys to Tuck-It-Away's attorneys, dated June 8, 1988, noting only the lis pendens. In the response to this letter (Ex. J) dated June 14, 1988, it was pointed out to Vestpro's attorneys that "the old law suit underlying the lis pendens was apparently withdrawn a number of years ago and the Lis Pendens should therefore be ineffective."
With respect to the claimed inaccuracy in the description of the premises, a corrected survey (Ex. H) was in the hands of the attorneys for both Vestpro and Tuck-It-Away in September of 1988. (See stipulations, par. 19). This revised survey adjusted the contract length of one of the courses from 24.87 feet to 21.26 feet. Proctor testified that no notice of objection to the closing was given because of this difference prior to the letter of December 12, 1988 (Ex. C). It was his opinion that there was no difference in the title survey of Exhibit H and the description in the contract. Based on CT Page 7598 conversations with Barry Kleinman, attorney for Vestpro, it was Proctor's clear understanding that Vestpro would be unable to close and was depending on an adjournment and relying on financing to be completed at some vague future date.
Testimony of Gregory H. Pidluski, President of Fuller and Company, land surveyors, who had prepared the original map of 1983, revealed that in 1988, he was requested to prepare a survey by the First American Title Insurance Company on behalf of Vestpro. This survey dated September 15, 1988 (Ex. H) revealed the dimension error heretofore noted (21.26 feet as opposed to 24.87 feet in the contract description). He attributed the discrepancy to the scrivener error and advised Kleinman of the same. In a letter from Kleinman to Pidluski, dated November 29, 1988 (Ex. M), a number of matters were discussed, but, significantly, Pidluski was told that it was "imperative that the survey be revised as soon as possible as we must close title to the property early next week." The letter contained no hint that there was objection to the difference in the dimension of one of the course lengths. It was Pidluski's opinion that there was no real difference in the size of the lot and the substance of the maps, that the 1983 map conformed to the 1988 map, and finally that Vestpro would gain nothing if the dimensions were as described in the 1983 map rather than in the 1988 survey. Actually, according to Pidluski, the square footage of the parcel contracted for by Vestpro, turned out to be greater in the 1988 survey than reflected in that of 1983.
Tuck-It-Away's final witness was David Jackson, Pullman, Comley, Bradley and Reeves' attorney, who was handling the transaction for Tuck-It-Away. Apart from matters which have already been discussed, Jackson testified that he received the letter of December 12, 1988, by fax on December 16, 1988 at 5:21 p.m. This was the first notice to him that Vestpro was claiming nonconformity in the property description and that it was cancelling the contract. Under cross-examination, he stated that Proctor was to handle the closing, and that Proctor would have been prepared but was told to halt such preparation because Vestpro would not have had the necessary funds available.
This has been an exhaustive review of the testimonial evidence in support of the respective claims. The court has difficulty in finding any legal basis to accord validity to Vestpro's claims. The contract of sale stipulated that time was of the essence with respect to the closing date. The final extension of October 14, 1988 set such closing date "through and including December 10, 1988." No closing took place on that date. Vestpro contended that since December 10th fell on a Saturday, it was agreed that the closing would occur on December 12th. The court can find no such agreement. In any event, CT Page 7599 there was no closing, either on December 10th, or on December 12th. Instead, after December 12, 1988, Vestpro's attorney sent notification to Tuck-It-Away and its attorneys, claiming a default on the part of Tuck-It-Away, cancelling the contract and requesting the return of all monies paid to Tuck-It-Away to date. As has been noted, this claim was based on the alleged inability of Tuck-It-Away to convey a marketable title because of the lis pendens, certificate of attachment and the nonconforming description of the premises. Gary Kleinman, Vestpro's attorney testified that he first became aware of the discrepancy of the property description on December 9, 1988 and called the Vestpro principals to tell them, in substance, that "they got lucky" and that he might have found a way to obtain an additional extension free of any charge. At this point, it would have been nice and a simple matter to call Sprayragen or his attorneys to advise of the claimed title defects. This would have permitted Tuck-It-Away to invoke paragraph 11 of the contract, allowing an adjournment of 30 days within which to perfect title. The court suspects that neither Kleinman nor Hochman believed there was real substance to the alleged claimed title defects and were attempting to use this as a device to gain an extension without payment. The court suspects further that the group was having more difficulty than it would admit in completing the entire financing to the tune of $5,100,000.00. Assertions by both Goldman and Hochman that Hochman was an available source of any money needed for an additional extension, and, indeed from Hochman that he had available the entire purchase price balance of $1,800,000.00, if needed, confirms such suspicion. If the amount of financing sought ($5,100,000.00) was as certain and as "close" as claimed, the court is puzzled by the unwillingness to pay a relatively small amount for an extension in order to avoid the risk of not appearing at the closing date.
Be that as it may, the court finds the reasons given for cancelling the contract to be of little merit. Kleinman was aware of the lis pendens in June of 1988 and in the stipulation entered by the parties at the beginning of the trial, it was agreed that Tuck-It-Away, or its attorneys were in possession of a release of the lis pendens and the attachment. Vestpro's post-trial brief argues that neither Tuck-It-Away nor any of its representatives ever informed Vestpro that it was in possession of the releases in question. The court is not aware of any such requirement. Tuck-It-Away's only obligation with respect to title defects was to have such defects cleared at the time of closing, and, this, Tuck-It-Away was prepared to do.
With respect to the claim of nonconformance of the legal description of the premises, the court finds Pidluski, the surveyor, to be a credible witness. He testified that having CT Page 7600 found the dimension error to be a scrivener's error, he so informed Kleinman, and provided the revised map of September 15, 1988 (Ex. L), showing the course length in question to be 21.26 feet instead of the previous 24.87 feet. Apart from this, Pidluski testified that there was no real difference in the size of the lot and substance of the maps, and no real difference in the square footage of the premises for which Vestpro contracted. More significantly, Goldman, had viewed the premises from three to six times, saw what he was buying as buildings and a discrepancy of some three feet in the length of one of the building walls would have had no impact on him. As is pointed out in Tuck-It-Away's post-trial brief, masonry and brick walls on boundary lines are considered as monuments and such control over courses and distances. Velsmid v. Nelson, 175 Conn. 221,227. The court must find that had the closing been consummated, Vestpro would have received exactly what it contracted for.
The court finds that on December 10, 1988, or for that matter, December 12, 1988, there was no basis for Vestpro's claim that Tuck-It-Away's title was defective.
In what the court considers an afterthought, Vestpro's post-trial brief raises the argument that although the contract provides for a closing date and place, it does not fix a time for the closing. Such argument is specious. Putting it in proper perspective, what Vestpro seems to be saying is that it was prepared in all ways to attend a closing on December 10, 1988, but it was the fault of Tuck-It-Away because Tuck-It-Away failed to notify it of the time. Vestpro had all day on December 10, 1988, to perform its obligations under the contract. The contract provided that time was of the essence and that on payment of the purchase price, the seller shall deliver — — — — [(contract par. 4) (emphasis supplied)]. It was Vestpro's obligation, under the contract, to tender the purchase price, before it could complain that Tuck-It-Away was unable to perform on its part. Instead, it failed to appear, although cutely, Goldman and Kleinman both testified that they never told any of Tuck-It-Away's representatives that Vestpro wouldn't or couldn't close on the closing date. It then preparpared and forwarded the transparent letter of December 12, 1988, in an apparent effort to somehow justify its inability to perform its obligations under the contract.
The issues are found in favor of Tuck-It-Away, Bridgeport, Inc. as against Vestpro Corporation. It is further found that on December 10, 1988, Tuck-It-Away, Bridgeport, Inc. was fully prepared and able to perform its contract obligations to convey a good, marketable title in fee simple. It is further found that Vestpro Corporation was in default under the terms of said contract. CT Page 7601
The plaintiff stakeholder, Pullman, Comley, Bradley and Reeves has requested allowance for reasonable counsel fees and disbursements. The same firm has appeared and represented Tuck-It-Away, Bridgeport, Inc. Its nominal position as stakeholder arises simply from the fact that as counsel for the seller, Tuck-It-Away, it holds in escrow the $100,000.00 deposit in dispute. It is difficult for the court to find, realistically, that it has "no interest in the funds."
Judgment may enter directing the plaintiff stakeholder, Pullman, Comley, Bradley and Reeves to turn over to Tuck-It-Away, Bridgeport, Inc., the deposit fund of $100,000.00, less a reasonable allowance for its costs and disbursements. For the reasons heretofore noted, no counsel fees are allowed.
BELINKIE STATE TRIAL REFEREE